**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Patricia DAVIES and Martin Kaprelian,
Defendants-Appellants.**

No. 84–1239.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 25, 1985.

Decided July 25, 1985.
Rehearing and Rehearing En Banc
Denied Aug. 29, 1985.

Frederick F. Cohn, Chicago, Ill., for plaintiff-appellee.

James M. Conway, Asst. U.S. Atty., Chicago, Ill., for defendants-appellants.

Before BAUER, ESCHBACH, Circuit Judges, and FAIRCHILD, Senior Judge.

BAUER, Circuit Judge.

Martin Kaprelian, Patricia Davies, and William Burke were indicted for conspiring to transport stolen merchandise in interstate commerce, and concealing and storing stolen merchandise moved in interstate commerce, in violation of 18 U.S.C. §§ 2314 & 2315. Two days before trial Davies entered a conditional plea of guilty but reserved an appeal on a pre-trial motion to suppress. A jury convicted Kaprelian on all three counts of the indictment and acquitted Burke. On January 18, 1985, this court dismissed Davies's appeal on the government's motion and without objection from Davies, as the brief on appeal has raised no issue regarding the suppression motion which Davies reserved for appeal. After a consideration of each issue raised by Kaprelian on appeal, we affirm his conviction.

I

On August 25, 1982, at approximately 6:00 p.m., Richard Romero, a manufacturer's representative for the Star of Africa Jewelry Company, drove his red Cadillac to a Standard Oil gasoline station in LaCrescent, Minnesota. He had approximately $70,000 in jewelry in two sample cases locked in the trunk of his car. Romero got out of the car, filled his tank at a self-service pump, and went to pay for the gasoline, leaving the keys in the ignition of the car.

While Romero was paying for the gasoline, a man came across the street from a Burger Chef restaurant and drove the Cadillac away. Jo-Ann Koeller was at the Burger Chef at this time and testified that she saw a medium brown car parked near her car. A man standing next to the brown car walked rapidly across the street and took off in Romero's Cadillac. About a half-hour later, Sue Kline was in Pettibone Park in LaCrosse, Wisconsin,[1] when a red Cadillac pulled into the park and a man got out and opened the trunk. Several minutes later, a brown Buick pulled up next to the Cadillac and the drivers of both cars placed two suitcases from the Cadillac into the trunk of the Buick. As both cars drove away, Kline wrote down the license number of the Buick. As she left the park later, she saw the Cadillac parked about five blocks away and gave the license number of the Buick to the police. About the same time that evening, Deborah Vogl also was in Pettibone Park and observed the two cars stop and the driver of the Cadillac get into the Buick. The Buick then left, leaving the unattended Cadillac behind.

At 6:40 p.m., Officer Dave Hanson of the LaCrosse Police Department stopped the Buick a half-mile from the park. Davies was the driver and sole occupant of the Buick, which had the same license number which Kline gave to the police later that evening. After several minutes of conversation with Hanson, Davies returned to the car and drove off. Six hours later, Davies

---

**1.** LaCrescent and LaCrosse are on opposite sides of the Mississippi River, five miles apart, with bridges and a highway across an island between. Pettibone Park is on the island, with access from the same highway. It takes only a few minutes to drive from LaCrescent to the Park, and the Park is an easy place to pull off the highway before going through downtown LaCrosse.

was spotted in the same Buick on the northwest side of Chicago.

Based upon investigative information from other jewel thefts linking Davies and Kaprelian, the Federal Bureau of Investigation on August 26 placed Kaprelian's last known address in Chicago under surveillance and searched the neighborhood for the brown Buick, which they did not find. While F.B.I. agents were watching the house, a teenaged girl left the house and rode off on a bicycle. The agents followed her in their car for several blocks and eventually pulled her to the side of the street by honking the car's horn. The agents identified themselves to her and asked if they could question her. She reluctantly stated that Kaprelian was her father and that Davies was his girlfriend, with whom he was living. She also reluctantly gave them a phone number at Davies's address which her father had given her. Based on this information, the F.B.I. began a surveillance of Davies's apartment.

The F.B.I. then placed Davies's apartment in Harwood Heights, Illinois, under surveillance, and observed Davies and Kaprelian the following afternoon enter one of the apartments, which was leased in the name of Helen Benson, one of Davies's known aliases. Fifteen minutes later Davies left carrying a tote bag and another small bag. She took an elevator to the garage of the apartment building and drove a yellow Oldsmobile out of the garage and parked it in front of the building. As Davies walked to the front door of the building, one of the agents watching the building arrested Davies.

In the ensuing search of the Oldsmobile, the agents found the bags that Davies was seen carrying. Inside the bags, the agents found most of the jewelry still in the original packages and display cases. Also found were a computer printout and business labels that Romero had reported stolen along with the jewelry. Kaprelian's fingerprints were identified on one of the jewelry packages, the computer printout, and a folder which contained the printout.

During Davies's arrest, two other agents were watching Davies's apartment and saw Kaprelian leave it. The agents stopped Kaprelian, identified themselves, conducted a pat-down search, and questioned him about his presence in Davies's apartment. When shown a picture of Davies, Kaprelian denied knowing who she was, even though he in fact had known her for nearly six years. Kaprelian asked to leave and was released twenty-five minutes later.

On August 27, F.B.I. agents found the brown Buick in the basement of Davies's apartment building in a stall rented to Davies under the name of Helen Benson. Inside the car was a LaCrosse, Wisconsin, newspaper dated August 25 and a road atlas opened to Wisconsin. The license plates on the car were different from those it had on August 25, the new plates having been issued on an application filed with the Illinois Secretary of State on August 26 or 27. Pursuant to a search warrant, the agents then searched Davies's apartment and found more of the stolen jewelry, some items containing Kaprelian's name, and a receipt for the new license plates.

## II. PARENT–CHILD PRIVILEGE

Kaprelian's first claim of error is that the stop by the investigating agents of Kaprelian's daughter was a violation of the fourth amendment and that the telephone number which they received from her and the other evidence obtained through use of the phone number should be suppressed as a violation of a purported parent-child privilege. Kaprelian argues that because he had given the telephone number to his daughter, who apparently was living with his estranged wife, in confidence and for emergency use, the agent's coercion of that number from his daughter is inadmissible evidence and that all evidence obtained through that number, principally Davies's address, also should be suppressed as tainted evidence.

■ We find several errors in this argument. First, to the extent that the agents' conduct can be construed as a violation of

the daughter's constitutional rights against unlawful seizures under the fourth amendment, which issue we need not decide, they are rights assertable by her alone and not by the defendant. A defendant "may not obtain exclusion of evidence on ground that someone else's rights were violated." *United States v. Williams,* 737 F.2d 594, 616 (7th Cir.1984). *See also United States v. Payner,* 447 U.S. 727, 731, 100 S.Ct. 2439, 2444, 65 L.Ed.2d 468 (1980). Kaprelian therefore cannot exclude the telephone number or the ensuing evidence on the basis of a violation of his daughter's fourth amendment rights, even if we were to find that such a violation had occurred.

Kaprelian next argues that the evidence should be excluded on the ground that it was obtained in violation of a purported parent-child privilege. Kaprelian claims that the parent-child privilege resembles the marital privilege, the attorney-client privilege, and the confessor-penitent privilege. Although he does not expressly rely on it, we assume that Rule 501 of the Federal Rules of Evidence is the basis for any parent-child privilege.

Rule 501 provides that in a criminal action the availability of any privilege is "governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience." FED.R.EVID. 501. Based upon reason and experience, the courts consistently have recognized, as Kaprelian points out, the marital privilege, the attorney-client privilege, the confessor-penitent privilege, and the doctor-patient privilege, although the precise boundaries of the privileges constantly are being debated and redefined. *See, e.g., Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (rejecting "control group" test for attorney-client privilege in corporate context as too narrow); *United States v. Byrd,* 750 F.2d 585 (7th Cir.1984) (holding that spousal testimonial privilege not assertable where the allegedly privileged communications occurred during a long-term separation). Thus the existence of a parent-child privilege must be determined upon a reading of the principles of common law.

Privileged communications are recognized by the courts "to protect those interpersonal relationships which are highly valued by society and peculiarly vulnerable to deterioration should their necessary component of privacy be continually disregarded by courts of law." *United States v. Byrd,* 750 F.2d at 589. Kaprelian argues on the facts of this case, that the F.B.I. agents, by questioning his daughter regarding his whereabouts, violated his familial privacy. This questioning, Kaprelian argues, resulted in "a statist intrusion into the most cherished of human relationships ... with the subsequent sense of betrayal, however unjustified, that the minor daughter must bear for having been a proximate source of the location and arrest of her father." Appellants' br. at 13.

Kaprelian relies principally on *In re Agosto,* 553 F.Supp. 1298 (D.Nev.1983), to support the existence of the privilege. The court in *Agosto* undertook a detailed analysis of the constitutional and policy bases which it believed supported its finding that the parent-child privilege should be recognized by the federal courts. In *Agosto,* the district court quashed a grand jury subpoena which would have required the witness to give testimony which might be included in evidence for use in any contemplated indictment of the witness's father. After a rather painstaking discussion of the origin and scope of the testimonial privileges and after an equally painstaking analysis of the constitutional protections for the family's right to privacy, the *Agosto* court concluded that the "expansive approach toward federal interpretation of testimonial privileges" under Rule 501, 553 F.Supp. at 1322, justified "affording the same protection to the parent-child relationship" as is afforded the marriage relationship itself. *Id.* at 1325. The court thus concluded:

There can be little doubt that the confidence and privacy inherent in the parent-child relationship must be protected and sedulously fostered by the courts.... *Agosto* may claim the parent-child privi-

lege not only for confidential communications which transpired between his father and himself, but he may likewise claim the privilege for protection against being compelled to be a witness and testify adversely against his father in any criminal proceeding.

*Id.*

Undeniably "[t]here does exist a 'private realm of family life which the state cannot enter,' *Prince v. Massachusetts*, 321 U.S. 158, 166 [64 S.Ct. 438, 442, 88 L.Ed. 645] (1944), that has been afforded both substantive and procedural protection" under the due process clause of the fourteenth amendment, *Smith v. Organization of Foster Families*, 431 U.S. 816, 842, 97 S.Ct. 2094, 2108, 53 L.Ed.2d 14 (1977) (footnotes omitted). As the *Agosto* court recognized, the Supreme Court cases are essentially divisible into two categories: cases challenging the constitutionality of the intrusion by the state into the family structure or its definition,[2] and cases involving the right to make certain decisions affecting the family unit.[3] However one chooses to characterize these cases, they "establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition." *Moore v. City of East Cleveland*, 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977) (opinion of Justice Powell).

But that does not end our inquiry. What the *Agosto* court failed to recognize is that such privileges, whether they be those traditionally recognized by the common law or new ones which courts seek to engraft into the common law, "are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974).

The Court reaffirmed the narrowness of privileges under Rule 501 in *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), when it modified the spousal privilege "so that the witness-spouse alone has a privilege to refuse to testify adversely," 445 U.S. at 53, 100 S.Ct. at 914, and in *United States v. Gillock*, 445 U.S. 360, 366, 100 S.Ct. 1185, 1190, 63 L.Ed.2d 454 (1980), wherein the Court refused to construct an evidentiary privilege barring the introduction of evidence of legislative acts in federal criminal prosecutions against state legislators. We thus believe that it would be inappropriate to engraft a parent-child privilege into Rule 501.

The Court's analysis in *Nixon* is particularly instructive on why the parent-child privilege should be rejected. In *Nixon*, President Nixon was seeking to quash a subpoena requesting the President to turn over to the district court various pieces of evidence, including tape recordings of telephone conversations. The President resisted the subpoena because it would require him to release "confidential conversations between a President and his close advisors that it would be inconsistent with the public interest to produce." 418 U.S. at 703, 94 S.Ct. at 3105. The Supreme Court began its analysis of the President's claim by recognizing that the importance of the "need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties ... is too plain to require further discussion." *Id.* at 705, 94 S.Ct. at 3106. The need for confidentiality, the Court recognized, had to be weighed against the fundamental and comprehensive need of our adversary system of criminal justice to develop all relevant facts, within the framework of the rules of

2. *See, e.g., Palmore v. Sidoti*, 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984); *Smith v. Organization of Foster Families*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977); *Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

3. *See, e.g., City of Akron v. Akron Center for Reproductive Health*, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983); *Parnham v. J.R.*, 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979); *Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978); *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967).

evidence. *Id.* at 709, 711–12, 94 S.Ct. at 3108, 3109. After weighing the various interests at stake in Nixon, the Court concluded that in that case the "generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial." *Id.* at 713, 94 S.Ct. at 3110. We similarly believe that Kaprelian's generalized claims regarding the well-recognized sanctity of family life must give way to the overriding needs of the truth-seeking process.

Moreover, every federal court, other than *Agosto*, that has considered the claim for a privilege based solely on the parent-child relationship has rejected the claim.[4] The Fourth, Fifth, Ninth, and Eleventh Circuits have expressly rejected the parent-child privilege. *In re Grand Jury Subpoena (Santarelli)*, 740 F.2d 816 (11th Cir. 1984); *United States v. Jones*, 683 F.2d 817 (4th Cir.1982); *In re Grand Jury Proceedings (Starr)*, 647 F.2d 511 (5th Cir.1981); *United States v. Penn*, 647 F.2d 876 (9th Cir.1980). *See also In re Matthews*, 714 F.2d 223 (2d Cir.1983) (witness compelled to testify against mother-in-law, father-in-law, and brother-in-law); *United States v. (Under Seal)*, 714 F.2d 347 (4th Cir.1983) (witness compelled to testify against brother and cousin). We agree with this weight of authority and now reject Kaprelian's claim of a parent-child privilege.

In *Jones*, for example, a twenty-nine year old male was held in contempt for refusing to answer grand jury questions during an investigation of his father. The

witness based his refusal on an asserted parent-child privilege and on the Supreme Court's decision in *Trammel*. The Fourth Circuit rejected Jones's asserted privilege holding that his reliance on *Trammel* was misplaced. "The result in *Trammel*, operating as it did to narrow, not expand, the scope of marital testimonial privilege, stands as an obstacle in Jones' path, not as an assistance." *Jones*, 683 F.2d at 818.

The Ninth Circuit, sitting en banc in *Penn*, also rejected the parent-child privilege on facts similar to this case. *Penn* involved the government's appeal from an order of the district court granting the defendant's motion to suppress a jar of heroin taken from defendant's back yard. The heroin was found after local police officers gave the defendant's five-year-old son a five dollar bill if he would show police the location of the heroin. Sitting en banc, the Ninth Circuit reversed the exclusion of the heroin, holding that "[t]here is no judicially or legislative recognized general 'family' privilege." 647 F.2d at 885. Among other things, Penn argued to the court that the bribe of her son violated substantive due process in that it intruded on a "zone of privacy" comprising family life. *Id.* at 883. The court held that to the extent that there could be found an intrusion in that case, the defendant was not entitled to a constitutional remedy. The court went on to point out, in admitting the evidence, that "past substantive due process cases based on 'family' interests all have involved systematic regulation of the

---

4. The government also points out that *In re Greenberg*, 11 Fed.R.Evid.Serv. 579 (D.Conn. 1982), also upheld a mother's claim that she could not testify against her daughter. That case is clearly distinguishable from *Agosto* and the present case in that the mother's claim was not based solely on the parental relationship but also upon deeply held religious views. The *Greenberg* court points out the narrowness of its holding:

> The asserted parent-child privilege is available to Mrs. Greenberg, though only insofar as it rests on her religious conviction that she cannot testify against her daughter willingly or under legal compulsion. The court emphasizes, however, that this privilege establishes a narrow exception to Mrs. Greenberg's legal

obligation to testify before the grand jury in accordance with the existing order of this court.

*Id.* at 587. We have no occasion in this case to comment on the correctness of the analysis in *Greenberg*.

We also point out that apparently only one state has currently recognized any type of parent-child privilege. *See In re Application of A & M*, 61 App.Div.2d 426, 403 N.Y.S.2d 375 (1978). Several states have expressly rejected the parent-child privilege. *See People v. Sanders*, 99 Ill.2d 262, 75 Ill.Dec. 682, 457 N.E.2d 1241, 1244–45 (Ill.1983); *Three Juveniles v. Commonwealth*, 390 Mass. 357, 455 N.E.2d 1203, 1206 (Mass. 1983); *Cissna v. State*, 170 Ind.App. 437, 352 N.E.2d 793, 795 (1976).

interest," and not isolated incidents of "intrusion" into family privacy. *Id.* at 884. Finding "[n]o legal basis, constitutional or other," to support the "family" privilege, the Ninth Circuit reversed the district court's suppression order. *Id.* at 885. We similarly find no basis for the parent-child privilege in criminal cases.

■ Even were there some substantial support for the defendant's proposition that there is a parent-child privilege this case would not be one in which it could be applied. Privileges apply only to prevent the use of testimony in a judicial proceeding. Kaprelian's daughter gave the F.B.I. agent his telephone number during the F.B.I.'s investigation of the jewel robbery. As the Supreme Court has noted, "[n]either *Hawkins* [v. *United States*, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958)], nor any other privilege, prevents the Government from enlisting one spouse to give information concerning the other to aid in the other's apprehension." *Trammel*, 445 U.S. at 52 n. 12, 100 S.Ct. at 913 n. 12. Kaprelian makes no assertion that the government ever intended to call his daughter at the trial; his assertions of privilege are based solely on her questioning during the investigation. Thus neither this phone number nor any other evidence obtained through this critical investigative lead are subject to suppression by the district court.

We thus reject Kaprelian's claim that there exists a privilege for communications between parents and their children in criminal cases and find no error in the admission of evidence developed as a result of obtaining Kaprelian's telephone number from his daughter.

## III. INVESTIGATIVE STOPS OF KAPRELIAN

Kaprelian's next claim of error involves two incidents in the hallway of Davies's apartment building. The first incident occurred on August 26, 1982. At about 1:00 p.m., both Davies and Kaprelian were seen entering Davies's apartment building, which was under surveillance by the F.B.I. as part of its investigation of the jewel theft. Kaprelian was carrying nothing and Davies was carrying a purse. Fifteen minutes later Davies left the building, went to the garage of the building and drove a yellow Oldsmobile to the front of the building. After she left the car and walked toward the front door of the building, two F.B.I. agents arrested her. At approximately the same time that these agents were following Davies, two other agents were watching Davies's ninth floor apartment from the building's hallway. Kaprelian left the apartment at some time during this surveillance.

As Kaprelian was leaving Davies's apartment, the agents stopped him to ask him a few questions and also conducted a patdown search for weapons. During their questioning, the agents asked Kaprelian whether he knew "Helen Benson," one of Davies's aliases and the one under which she rented the apartment, and asked him whether he recognized a picture of Davies. Kaprelian denied knowing Benson or recognizing the woman in the photograph and demanded that he be allowed to leave. The agents refused to allow Kaprelian to leave until they had the approval of their superiors and detained him in the hallway for another twenty-five to thirty minutes.

The second encounter with Kaprelian occurred the following day, August 27, when Kaprelian was again seen leaving Davies's apartment. Two Harwood Heights, Illinois, police officers had stationed themselves outside of Davies's apartment and were under orders from the F.B.I. not to let anyone enter or leave the apartment until the F.B.I. could secure a search warrant. As Kaprelian was leaving the apartment the officers stopped him and told him that he was not free to leave.

One of the agents who had questioned Kaprelian on August 26 testified at trial about Kaprelian's denials of knowledge of Davies. This testimony was apparently admitted as evidence of a false exculpatory statement by Kaprelian. During a pretrial suppression hearing, the district court held that this testimony was admissible because the stop of Kaprelian on August 26, at

least up to the point that Kaprelian demanded that he be allowed to go was a classic *Terry*-stop, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and that because the testimony which the government sought to admit was derived only from this portion of the stop, there was no basis on which to suppress the testimony.

Kaprelian asserts that the district court incorrectly concluded that the stop on August 26 was not an arrest, arguing that "[t]he location, nature of the seizure, and length of the detention demonstrate that this was an arrest." Appellants' br. at 15. Kaprelian relies principally on *Sharpe v. United States*, 660 F.2d 967 (4th Cir.1981), *rev'd* —— U.S. ——, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), for the proposition that because Kaprelian was held for approximately forty-five minutes, his detention was a *per se* illegal detention. In *Sharpe*, the Fourth Circuit analyzed the facts under *Terry* and determined that the length of the detention alone made it invalid. The court stated that it could not "overemphasize the importance of the brevity requirement for investigative stops predicated upon less than probable cause." 660 F.2d at 970. The court found that the thirty to forty minute detention of the auto's driver and the fifteen minute detention of the truck's driver without probable cause for arrest "effectively transformed them into de facto arrests without basis in probable cause, unreasonable seizures under the Fourth Amendment." *Id.* The Supreme Court, however, recently reversed the Fourth Circuit's decision in *Sharpe*. —— U.S. ——, 105 S.Ct. 1568, 84 L.Ed.2d 605.

■ As the Supreme Court noted in *Sharpe*, one of the benchmarks of *Terry* analysis, however, is to examine each case and to determine whether in the circumstances the stop was justified at its inception and whether the stop was "reasonably related in scope to the circumstances which justified the inference in the first place." *Sharpe*, 105 S.Ct. at 1573, quoting *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879. The initial justification must come from articulable

and objective facts. *Terry*, 392 U.S. at 29, 88 S.Ct. at 1884. The stop must be brief, and only long enough to satisfy the investigative nature of the stop. *Sharpe*, 105 S.Ct. at 1574, *Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975); *United States v. Borys*, 766 F.2d 304, 312 (7th Cir.1985).

■ "If the purpose underlying a *Terry*-stop—investigating possible criminal activity—is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry* and *Adams* [*v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)]." *Michigan v. Summers*, 452 U.S. 692, 700 n. 12, 101 S.Ct. 2587, 2593 n. 12, 69 L.Ed.2d 340 (1981).

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest simply to shrug his shoulders and allow a crime to occur or a criminal to escape.... A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Adams v. Williams*, 407 U.S. at 146–47, 92 S.Ct. at 1923. As the Supreme Court's decision in *Sharpe* makes clear, that there is no talismanic time beyond which any stop initially justified on the basis of *Terry* becomes an unreasonable seizure under the fourth amendment. 105 S.Ct. at 1575. In view of all the facts of this case known to the F.B.I. on August 26, we believe as the district court did that the stop of Karpelian on August 26 was not an unreasonable seizure under *Terry*.

■ The district court's findings regarding the circumstances of the stop in this case are amply supported on the record before us. The court specifically found that

> [t]hrough F.B.I. departments, the agents had reason to believe that both Davies and Kaprelian were involved in the robbery.... His presence in the hallway of

Davies's apartment [the day following the jewel theft] reinforced that reasonable suspicion that Kaprelian was involved with Davies in the crime.

The investigating agents also had evidence indicating that Davies and Kaprelian were both suspects in three separate cases involving interstate transportation of stolen property during the 1970s and linking them to a jewelry theft in Missouri. Moreover, the agents had discovered that shortly after Davies was seen back in the Chicago area six hours after the stop in LaCrosse, Wisconsin, she entered a bar near her home looking for "Marty." The connection between Kaprelian and Davies also was confirmed on August 26th during the questioning of Kaprelian's daughter. We therefore agree with the district court that articulable and objective facts justified the initial stop.

Armed with the information that justified the initial stop and Kaprelian's denial of knowledge of Davies so shortly after the crime being investigated, we think that under *Terry* it was reasonable for the agents to detain Kaprelian an additional thirty minutes for further questioning and advice from their superiors.

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.... A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.

*Sharpe*, 105 S.Ct. at 1575–76 (citations omitted). Davies was arrested on probable cause shortly thereafter. Kaprelian was not moved from the apartment building nor in any other way seriously refrained in his movements. We therefore believe that the entire forty-five minute stop was a "temporary seizure for the purpose of questioning limited to the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983).

Kaprelian next claims that his detention in the same hallway on August 27 amounted to an arrest and that certain evidence obtained at that time must be suppressed. The evidence which he seeks to suppress, however, is one of the agent's statements at trial that he had observed Kaprelian in the hallway of the apartment on August 27. Regardless of the validity of his detention on August 27, we fail to seek how the statements of the agent's observations can be suppressed. They are not statements by Kaprelian, nor are they in any way connected with his arrest or detention; the agent's observations in no way implicate the fourth amendment. The fourth amendment protects one's reasonable expectations of privacy. As such, the protections do not extend to one's movements in plain view. Since Kaprelian does not claim that the officer's presence in the hallway of Davies's apartment building violated any expectation of privacy he may have had, we fail to see how he now can complain that they saw him exiting her apartment. "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967).

## IV. IN–COURT IDENTIFICATION

Kaprelian next argues that an in-court identification of Kaprelian by Deborah Vogl was unreliable and should have been suppressed. On the evening of the jewel theft, Deborah Vogl was in Pettibone Park in LaCrosse, Wisconsin, with several of her friends. She observed two cars, a Cadillac and a Buick, stop in the park and the driver of the Cadillac get into the Buick and leave the Cadillac unattended in the park. She observed the driver of the Cadillac from about fifteen feet away, and "was really focusing a lot of attention" on the Cadillac because it "had almost hit [her] roommate and [her] dog." Tr. 190. About an hour

later, she described the driver of the Cadillac to police as being 5'10", slim, possibly in his early thirties, dark hair and dark mustache, a white male with dark skin and possibly of Greek or Italian background. R. 113. On September 29, 1982, Vogl viewed six black and white photographs, from which she identified a photograph of Kaprelian as having a "pronounced similarity to the driver of the Cadillac ... [but with] an apparent lack of hair immediately behind the forehead ... [and no] mustache." R. 113.

Between September 29, 1982, and December 8, 1983, when Vogl testified at Kaprelian's trial, she did not again view Kaprelian in a line-up and was not otherwise asked formally to identify Kaprelian. At trial, Vogl was asked to identify the man she saw driving the Cadillac. She identified Kaprelian. Vogl testified on a Thursday afternoon. Kaprelian did not object to her testimony at the time and did not file a formal motion to suppress her in-court identification of him until the following Monday morning. Kaprelian now argues that the district court incorrectly denied the suppression of that identification.

Kaprelian bases his request to suppress the identification on the grounds that the identification was unreliable. He bases his unreliability argument on three factors. First, Vogl stated to police officers on the evening of the theft that the driver of the Cadillac was "in the vicinity of 5'10"," R. 113, whereas Kaprelian is in fact 5'3". Second, Kaprelian argues that Vogl was a biased witness, in that she was an intern for the Wisconsin Department of Corrections. Finally, he argues that the in-court identification was unnecessarily suggestive because at the three tables in the courtroom there were only five males and only one of them, Kaprelian, even vaguely fit her "slim male" description.

■ In analyzing the validity of this in-court identification, we are guided by the standards which the Supreme Court set forth in *Simmons v. United States,* 390

U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

One month after Vogl saw a man whom she shortly thereafter described to the police leave a Cadillac in LaCrosse, Wisconsin, she picked Kaprelian out of a six-photo display. Although she found some discrepancies between the photo and the man she recalled seeing on August 25, she felt that certain features bore a "pronounced similarity" to the driver of the Cadillac. The major discrepancy was the hairline, lack of a mustache, and height. Kaprelian has not argued, however, that the photo identification was impermissibly suggestive. Having failed to assert that the photographic identification in which Vogl identified Kaprelian was impermissibly suggestive we will not now hold the subsequent in-court identification invalid.

■ Vogl's previous identification of Kaprelian diminishes the likelihood of an in-court misidentification. Because Kaprelian did not object to the identification at the time it was made at trial, we believe that the trial court properly left the credibility of Vogl's ability to identify Kaprelian to the jury. She testified at trial as to the length of her viewing of the driver of the Cadillac, the weather and lighting conditions, and the general circumstances of the occurrence on August 25. She also was subject to cross-examination regarding her photographic identification. The jury was fully aware of any bias that Vogl may have had to testify favorably for the prosecution because of her employment with the Wisconsin Department of Corrections.

■ Moreover, a defendant does not have a constitutional right to an in-court line-up identification of the defendant, *United States ex rel. Clark v. Fike,* 538 F.2d 750, 755–56 (7th Cir.1976), and the

exact manner of the identification is addressed to the trial court's discretion. *United States v. Williams,* 436 F.2d 1166, 1168–69 (9th Cir.1970). Generally, the question of the suggestiveness or credibility of the in-court identification is to be resolved ultimately by the jury after the defendant has had an opportunity to test the accuracy of an identification through cross-examination. *United States v. Bush,* 749 F.2d 1227, 1231 (7th Cir.1984). Only when there is "a very substantial likelihood of irreparable misidentification," *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968), is the credibility of the identification not left for the jury to decide. *Bush,* 749 F.2d at 1231. We therefore find no error in leaving the reliability of the identification for the jury's determination.

## V. CROSS–EXAMINATION

Kaprelian next argues that the trial court committed reversible error by refusing to allow Kaprelian to "elicit from Special Agent [Joseph] Dragon the single fact that a properly conducted line-up is better designed to secure a fair and reliable identification procedure than a show-up or other [identification] procedure." Appellants' br. at 26. The government contends that its objections to Kaprelian's cross-examination were properly sustained at trial because "the specific questions asked were both improper and irrelevant." Appellee's br. at 23.

Kaprelian cross-examined Dragon extensively about the identification methods used for each of the several eye-witnesses to the events of the jewel theft and secured Dragon's admission that no witnesses were ever asked to view Kaprelian in a line-up. The court then sustained the government's objection to Kaprelian's question that "You have been trained that the scientific and proper method for obtaining identification is through a line-up, haven't you?" Tr. 282. After continued questioning on how line-ups are generally conducted, the court again sustained the government's objection.

Q. What have you been trained as to concerning whether you should show a suspect singularly to a witness?

A. I am [not] sure I understand what you mean.

Q. Have you been told whether you should—

GOVERNMENT: Judge, I am going to object. This is improper.

THE COURT: I am going to sustain the objection as to the next question. Tr. 282–83.

In examining the validity of the trial court's sustaining the government's objection to these two cross-examination questions, we must consider that "[t]he right to unbridled cross-examination of an adverse witness is not absolute and a trial judge has considerable discretion to place restrictions on the scope of cross-examination once the right to confront witnesses has been substantially exercised." *United States ex rel. Scarpelli v. George,* 687 F.2d 1012, 1014–14 (7th Cir.1982), *cert. denied,* 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983). Kaprelian asked Dragon numerous questions regarding how the witnesses had identified him and about the fact that no line-up was ever conducted. R. 274–282. We think these questions gave Kaprelian the "substantial exercise" of his right to confront Dragon. That Kaprelian was not allowed to solicit Dragon's "expert" opinion about the hypothetical preference for and reliability of a line-up was not error.

Moreover, "the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence and his action is to be sustained unless manifestly erroneous." *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). As the Supreme Court has recognized, whether the identification procedure is a line-up, a show-up, or the presentation of the subject alone to the witness, "[i]t is obvious that risks of suggestion attend either form of confrontation and increase the dangers inherent in eyewitness identification." *United States v. Wade,* 388 U.S. 218, 229, 87 S.Ct. 1926,

1933, 18 L.Ed.2d 1149 (1967). The critical inquiry in any given case is not necessarily what type of identification procedure was used, but whether the specific procedure was reliable or whether it was unnecessarily suggestive. *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972). "The danger that the use of [an identification] technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error." *Simmons v. United States*, 390 U.S. at 384, 88 S.Ct. at 971. Kaprelian was never prevented from undertaking this line of cross-examination. We thus believe that the trial court acted quite properly in excluding Kaprelian from eliciting Dragon's opinion about the reliability of an identification which never occurred.

## VI. MISCELLANEOUS CLAIMS

■ The defendant claims two other errors which we find without merit. The first is that the government's labeling of its exhibits was argumentative, and thereby violated the defendant's right to due process. This court has held that labels on exhibits which are "a neat condensation of

the government's whole case against the defendant" constitute prejudicial error. *United States v. Ware*, 247 F.2d 698, 700 (7th Cir.1957). *See also United States v. Brown*, 451 F.2d 1231, 1233 (5th Cir.1971).[5] But the labels on the government's exhibits in this case to which the defendant objects come nowhere close to the type of labels found prejudicial in *Ware* and *Brown*. The labels merely state the location in which of the various pieces of evidence, including the jewelry and Mr. Romero's business records, were found. For example, some of the labels read simply "Oldsmobile–1" and "Apartment 5A," indicating that the piece of evidence was found either in the Oldsmobile or in Davies's apartment. The labels were neither argumentative nor "condensations of the government's case;" they were simply identifying marks.

■ The defendant also claims that F.B.I. Agent Donald Bishop's single reference on cross-examination to the Oldsmobile as belonging to Davies and Kaprelian constituted reversible error. We disagree. To the extent that this statement caused any error, the district court gave immediate and sufficient limiting instructions to the jury. *Opper v. United States*, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954)

---

5. In *Ware* the evidence envelopes contained notations such as these notations by the narcotics agent written on exhibit no 1:

Treasury Department
Bureau of Narcotics
Case No. 111–7208

District No. 9
Name Larry Ware Alias "Nick"
Address Chicago, Illinois
Evidence 1 oz. 266 grains Heroin—contained in 3 glassine envelopes
(Not original containers)
How Obtained—Purchased by W.H. Newkirk
Where obtained 4000 block Prairie Ave., Chicago, Ill.
Date Oct. 23, 1954 Time 12:00 Noon
Amount paid, $600.00
Witnesses: J.T. Fields
N.M. Durham
Agent reporting case William H. Newkirk
Remarks: Exhibit #2 weighed and sealed by Agent J.T. Fields, in the presence of Agent F.U. Turner and delivered to the U.S. Chemist, Chicago, Ill., by Agent Fields, for analysis.

(Reverse of first envelope)
Weighed and Sealed

1 Oz. 266 grains Heroin
Oct. 25, 1954
By: J.T. Fields
Witnessed by F.U. Turner

247 F.2d at 699 n. 1.
Similarly, *Brown* held that it was error for the government to submit its evidence in envelopes with notations similar to the following:
District: No. 6 Case No: (illegible)
Name: Louis Hayes, et al alias Mr. Clean
Address: Jacksonville, Florida
Evidence: Two one half (illegible) suspected Cocaine
How Obtained: Purchased by Agent Wilkes
Where Obtained: Front of Sportsman Grill, 510 Broad St.
Jacksonville, Florida
Date: 9/6/68
Amount Paid: $155.00
Witnesses: Agents Jessup and Curry
Agent Reporting Case: Agent Jessup
Remarks: Evidence turned over to Agent Jessup for transmittal to U.S. Chemist, Atlanta, Georgia.
451 F.2d at 1233 n. 2.

("Our theory of trial relies upon the ability of a jury to follow instructions."). We fail to see how one statement suggesting ownership of Davies's automobile to Kaprelian is "persuasive evidence of his guilt." Appellants' br. at 33. There was an abundance of evidence at trial tying Kaprelian to Davies, including evidence that he and Davies both had used the auto in question. We thus find no error in Bishop's statement.

On consideration of the entire record before us in this case, we affirm Kaprelian's conviction.

AFFIRMED.