**STATE of Maine**

v.

**Robert WILLOUGHBY et al.**

Supreme Judicial Court of Maine.

Argued Sept. 2, 1987.
Decided Oct. 28, 1987.

James E. Tierney, Atty. Gen., Charles K. Leadbetter (orally), Asst. Attys. Gen., Augusta, for plaintiff.

Michael J. Levey (orally), Winthrop, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, WATHEN, GLASSMAN, SCOLNIK and CLIFFORD, JJ.

McKUSICK, Chief Justice.

This appeal squarely raises the question whether an intrafamily testimonial privilege exists under either the Maine or the United States Constitution. Holding that it does not, the Superior Court after a jury trial convicted the three defendants, Robert Willoughby, his wife Rita, and his daughter Stacy, all of Gardiner, of criminal contempt for refusing to testify in the earlier trial of Philip Willoughby for the murder in Augusta of Paula Roberts. The Superior Court sentenced Robert and Rita to the county jail for nine months and Stacy for thirty days. On their consolidated appeals, we find no reversible error in either their convictions or their sentences.

Robert and Rita Willoughby are Philip's parents, and Stacy, his sister. At the murder trial of Philip in April 1985,[1] the State called all three of the present defendants as witnesses and asked them about any statements made to them by Philip immediately after the Paula Roberts murder in December 1983. At the time of the murder Philip was in his early twenties and was no longer living at the family home in Gardiner. On the stand at Philip's murder trial,[2] all three refused to answer the prosecutor's questions, asserting an intrafamily testimonial privilege. Each time the prosecutor posed a question about Philip's statements to them, the three witnesses responded as follows:

I respectfully decline to answer on the basis of a privilege and constitutional right of privacy which precludes me from being forced to testify adversely to my son [or in Stacy's case, brother] or from divulging intrafamily confidential communications. This privilege and constitutional right emanates from the First, Fourth, Fifth, Ninth and Fourteenth Amendments of the United States Constitution and similar provisions of the Constitution of the State of Maine.

Each time the Willoughbys thus asserted an intrafamily privilege, the Superior Court justice presiding at the Philip Willoughby trial ruled that no such privilege exists in Maine and then ordered the witnesses to answer the questions put to them. They again refused, again raising the claimed intrafamily privilege. The presiding justice thereupon cited Robert, Rita, and Stacy for criminal contempt, to be tried later before a different jury.

On May 17, 1985, after a two-day trial held in York County presided over by a different Superior Court justice, a jury found all three guilty of criminal contempt. On appeal they make the following three contentions: (1) that a constitutional intrafamily testimonial privilege justified their refusal to answer questions, (2) that criminal contempt requires a specific intent by the person charged to disrupt the orderly progress of trial, and (3) that 16 M.R.S.A. § 155 (1983) prohibits a jail term in excess of three months for the refusal to answer questions allowed by the court.

## I. No Constitutional Intrafamily Testimonial Privilege

■ We hold that neither the United States nor the Maine Constitution recognizes a privilege not to testify in court about communications between a child and his parents or between siblings.[3]

■ At the outset of considering the Willoughbys' claim of a constitutional intrafamily testimonial privilege, we must remind

1. Our affirmance of Philip Willoughby's conviction is reported in *State v. Willoughby*, 507 A.2d 1060 (Me.1986).

2. For an earlier attempt by the Willoughbys to get their claim of an intrafamily testimonial provilege before this court, *see In re Willoughby*, 487 A.2d 636 (Me.1985).

3. Having so concluded, we hold *a fortiori* that no constitutional privilege exists for statements made by the adult Philip Willoughby to his parents and his sister at a time that he was no longer living at home with them.

ourselves of the great importance to the fair and efficient administration of justice that all evidence relevant to either the prosecution or the defense of a criminal proceeding be available in court. As the United States Supreme Court stated in *United States v. Nixon*, 418 U.S. 683, 709, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974):

> The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense.

As a result the Supreme Court has strictly construed testimonial privileges, noting with approval Dean Wigmore's statement of the "fundamental maxim that the public ... has a right to every man's evidence." 8 J. Wigmore, *Evidence* § 2192, at 70 (McNaughton rev. 1961). *See Trammel v. United States*, 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980); *United States v. Bryan*, 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950). We too have emphasized in an early discussion of the interspousal testimonial privilege that "the State should have all possible constitutional means to ferret out and punish crime." *State v. Black*, 63 Me. 210, 212 (1874). Any witness who has relevant evidence should be constitutionally privileged to refuse to testify only if the Constitution guarantees that privilege in express terms, as does the Fifth Amendment, or if nonrecognition of the claimed privilege would clearly and substantially impair rights and values protected by the Constitution. In neither of our Constitutions do we find any

such basis for an intrafamily testimonial privilege.

Researches of both counsel and this court have been able to discover almost no authority to support the Willoughby's claim, and abundant authority opposed to it. Only a single federal district court judge in Nevada and some lower state courts in New York have recognized in some form a constitutional intrafamily testimonial privilege. *See In re Agosto*, 553 F.Supp. 1298 (D.Nev.1983); *People v. Harrell*, 87 A.D.2d 21, 26, 450 N.Y.S.2d 501, 504 (1982), *aff'd on other grounds*, 59 N.Y. 620, 449 N.E.2d 1263, 463 N.Y.S.2d 185 (1983); *In re Ryan*, 123 Misc.2d 854, 855, 474 N.Y.S.2d 931, 932 (1984). On the other hand, every United States court of appeals and every state supreme court that has considered the issue has refused to recognize any such privilege. *See, e.g., United States v. Davies*, 768 F.2d 893, 899 (7th Cir.1985); *Port v. Heard*, 764 F.2d 423, 430 (5th Cir.1985); *United States v. Penn*, 647 F.2d 876, 883–84 (9th Cir.), *cert. denied*, 449 U.S. 903, 101 S.Ct. 276, 66 L.Ed.2d 134 (1980); *Three Juveniles v. Commonwealth*, 390 Mass. 357, 363–64, 455 N.E.2d 1203, 1207–08 (1983), *cert. denied*, 465 U.S. 1068, 104 S.Ct. 1421, 79 L.Ed.2d 746 (1984).

Despite the absence of any significant authority for the claimed privilege, and despite the fact that the United States Supreme Court has never recognized the privilege,[4] the Willoughbys urge this court to construct such a privilege on the basis of emanations from the Supreme Court's right of privacy decisions. We refuse to do so. The Supreme Court's privacy decisions do not extend that far. The Court's purpose in those cases has been to insulate from direct governmental regulation certain types of conduct considered to be of core importance to the home and the family. *See, e.g., Zablocki v. Redhail*, 434 U.S. 374, 383–87, 98 S.Ct. 673, 679–80, 54 L.Ed.2d 618 (1977) (reaffirming fundamental character of right to marry as aspect of right to privacy); *Moore v. City of East*

---

**4.** The Supreme Court has noted that the interspousal testimonial privilege is anchored in the Anglo–American common law tradition rather than specific constitutional guarantees. *Trammel v. United States*, 445 U.S. 40, 43–46, 100 S.Ct. 906, 908–910, 63 L.Ed.2d 186 (1980).

*Cleveland,* 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977) (striking down city housing ordinance that defined narrowly the composition of a "family" that could live in a single-family dwelling); *Roe v. Wade,* 410 U.S. 113, 152–53, 93 S.Ct. 705, 726–27, 35 L.Ed.2d 147 (1973) (right of woman to terminate pregnancy during first two trimesters); *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 1824, 18 L.Ed.2d 1010 (1967) (striking down miscegenation statute); *Griswold v. Connecticut,* 381 U.S. 479, 485–86, 85 S.Ct. 1678, 1682–83, 14 L.Ed.2d 510 (1965) (upholding right of married couples to use contraceptives in their home). *Cf. Bowers v. Hardwick,* —— U.S. ——, 106 S.Ct. 2841, 2844, 92 L.Ed.2d 140 (1986) (refusing to extend right of privacy protection to consensual adult homosexual sodomy since no connection between such conduct and family, marriage, or procreation). An order to testify in court, however, in no way directly regulates conduct essential to family life. *See United States v. Davies,* 768 F.2d at 899; *United States v. Penn,* 647 F.2d at 883–84. No constitutional value of privacy, as delineated by those Supreme Court cases, is clearly and substantially impaired by a court's refusal to cast a veil of confidentiality around conversations between a parent and a child or between siblings. Thus we can find no support for an intrafamily testimonial privilege in the Supreme Court's privacy decisions.

## II. *No Specific Intent to Obstruct Justice Required for Criminal Contempt*

■ At their contempt trial the Willoughbys tried unsuccessfully to introduce evidence that arguably tended to show that they had tried to raise their claim of intrafamily privilege in a manner to avoid delaying the Philip Willoughby murder trial and other evidence that arguably tended to show that they had made their claim in a good faith belief that a constitutional intrafamily privilege existed. All that evidence they claimed to be relevant because, as they contend, a subjective intent on their part to obstruct the administration of jus-

tice is a necessary element of the criminal contempt for which they were tried. The justice presiding at the contempt trial excluded the proffered evidence, and correctly so. To be proven guilty of criminal contempt for disobeying a court order to answer questions in a pending court proceeding, the Willoughbys did not have to have a specific intent to obstruct the administration of justice,[5] nor did good or bad faith on their part have any relevance.

The only authority cited by the Willoughbys to support their argument for the requirement of a specific intent is a definition of contempt in an Illinois case, picked up and quoted by this court in *In re Holbrook,* 133 Me. 276, 280, 177 A. 418, 420 (1935), along with an assortment of other definitions from other jurisdictions:

> any act which *is calculated* to embarrass, hinder or obstruct the court in the administration of justice....

(Emphasis added) We reject the Willoughbys' suggestions that "is calculated" as there used means "is specifically intended"; we read "is calculated" as meaning nothing more than "has a natural tendency." Significantly for present purposes, the opinion in *Holbrook* in the course of the same string of definitions of "contempt" quoted a Vermont case and a different Illinois case for the simple proposition: "Refusal of a witness to answer any question which he may lawfully be required to answer is contempt." *Id.*

■ A contempt occurs whenever a witness intentionally refuses to answer a question put to him in court after the judge has ruled against his claim of privilege and has ordered him to answer. *Gendron v. Burnham,* 146 Me. 387, 406, 82 A.2d 773, 784–85 (1951). *See also* 17 Am.Jur.2d *Contempt* § 32, at 38 (1964). In *Gendron* we held that although a witness may refuse initially to answer a question as the means for asserting a claim of privilege, once he has received an unfavorable ruling on the privilege by the trial judge, the witness's refusal to obey the court's order to answer

---

5. Neither at trial, nor on appeal, have the Willoughbys ever argued that the disobeyance of

the court's order did not in itself obstruct the administration of justice.

is unjustified and contumacious. *Gendron v. Burnham,* 146 Me. at 406, 82 A.2d at 784–85. As we noted in *State v. DeLong,* 456 A.2d 877, 881 (Me.1983), "refusal to answer questions in [the] 'actual presence' of [the] court is criminal contempt and may be punished summarily." *Id.* at 881 (quoting *Baker v. Eisenstadt,* 456 F.2d 382, 388 (1st Cir.), *cert. denied,* 409 U.S. 846, 93 S.Ct. 110, 34 L.Ed.2d 87 (1972)). *Accord United States v. Wilson,* 421 U.S. 309, 314–16, 95 S.Ct. 1802, 1805–06, 44 L.Ed.2d 186 (1975) (unjustified refusal to answer, "although not delivered disrespectfully," falls within Fed.R.Crim.P. 42(a) and constitutes criminal contempt); *In re Boyden,* 675 F.2d 643, 644 (5th Cir.1982) (refusal to answer questions is criminal contempt under Fed.R.Crim.P. 42(a)). These cases have not required a specific intent on the part of the recalcitrant witness to obstruct the administration of justice—and properly not, since requiring for criminal contempt any culpable state of mind beyond an intent to disobey the court's order to answer would seriously erode the authority of the trial judge to control the course of the proceeding in his courtroom.

A subjective intent to disobey the court's order to answer was of course a necessary element of the criminal contempt with which the Willoughbys were charged. However, a subjective intent on their part to obstruct the administration of justice was not. The Willoughbys' good faith in asserting a privilege not to testify, which might tend to negate any specific intent to obstruct the administration of justice, was simply irrelevant at their contempt trial. The presiding justice properly excluded evidence of the absence or presence of that specific intent.

### III. *No Statutory Limitation on Court's Power to Sentence for Contempt*

██ Finally, we reject the claims of Robert and Rita Willoughby that the Superior Court exceeded its authority by sentencing them to jail for nine months. They assert that the court's power to sentence them for refusal to answer the questions posed is limited to three months by 16 M.R.S.A. § 155. That statute provides:

> When a witness in court refuses to answer such questions as the court allows to be put, he shall be punished by a fine of not more than $100 or by imprisonment for not more than 3 months.

We do not read section 155 as an attempt by the legislature to restrict the inherent authority of the courts to punish for contempt. Rather we understand section 155 to create simply an alternative method by which the public interest in obtaining testimony in court may be vindicated. Criminal prosecution, pursued at the discretion of the prosecuting authorities, for the Class E crime of "refusal to answer" under section 155 is separate and independent from any criminal contempt proceeding that is initiated by the court itself.

██ The power to punish for contempt is inherent in the judicial authority of Maine's courts of record and is not dependent upon statute. 3 Glassman, *Maine Practice: Rules of Criminal Procedure Annotated* § 42.1, at 384 (1967). In *Alexander v. Sharpe,* 245 A.2d 279, 282 (Me.1968), we stated:

> It has long been recognized that the power of a court to punish summarily for a contempt committed in the presence of the [c]ourt is inherent in the nature and constitution of a court and necessary for the court to possess in the exercise of all its other powers.

*See also State v. DeLong,* 456 A.2d at 879; *In re Holbrook,* 133 Me. at 280–81, 177 A. at 420; *Morrison v. McDonald,* 21 Me. 555, 556 (1842).

Since a court's power to punish contempt is necessary for the exercise of all its other powers, restrictions imposed upon that contempt power would hamper the court in discharging its responsibilities for the administration of justice. The receipt of testimony is an essential aspect of a court's hearing and resolving of legal disputes. The court's power to punish a contumacious refusal to testify, therefore, is at the core of its inherent authority as a judicial tribunal.

The Willoughbys' argument means that section 155 would strip any Maine court of the power to impose a fine of more than $100 upon a witness who steadfastly disobeys an order of court to answer a question; and no jail sentence might exceed three months. Such an application of section 155 would severely restrict the inherent judicial authority to punish contempt. If we were to apply the statute in that way it would violate the strict separation of powers mandated by article III of the Maine Constitution. *See Bossie v. State,* 488 A.2d 477, 480 (Me.1985); *State v. Hunter,* 447 A.2d 797, 799–800 (Me.1982). We do not, however, understand the legislature to have imposed such a restriction through section 155. Rather, we read section 155 in light of our basic principle of statutory construction "that this Court is bound to avoid an unconstitutional interpretation of a statute if a reasonable interpretation of the statute would satisfy constitutional requirements." *Bossie v. State,* 488 A.2d at 479. *See also State v. Crocker,* 435 A.2d 58, 63 (Me.1981). Here an analysis of the statutory development of section 155 makes clear that the legislature intended by its passage to create an alternative statutory offense for "refusal to answer," independent of any inherent court authority to punish for contempt.

Section 155 traces its origins to an 1847 legislative enactment that granted authority to justices of the peace and judges of municipal and police courts to punish a person failing to attend trial when summoned as a witness and refusing to answer questions allowed by the judge. The act provided in relevant part:

If such witness, being present before such justice [of the peace] or judge [of a municipal or police court], shall refuse to answer such questions as may be propounded to him under the direction of such justice or judge, he may fine such witness at discretion, not exceeding twenty dollars, and commit him until the same and all costs attending such commitment shall be paid.

P.L.1847, ch. 9, § 2. Rather than acting to restrict the inherent authority of Maine's courts of record, this precursor of section 155 merely added to the powers of Maine tribunals of limited statutory authority.[6]

That general empowering (rather than limiting) character of the 1847 statute carried with it throughout its later history. As part of the general 1857 statutory revision, the criminal offense for refusal to answer expanded beyond limited tribunals to apply to the refusal to answer in any Maine court.[7] R.S. ch. 82, § 86 (1857). The 1857 revision contained no suggestion that the changes were intended to impose any limits on the inherent power of courts of general jurisdiction to punish contempt. On the contrary, it is difficult to imagine that the 1857 legislature in the course of merely revising the statutes meant such a radical restriction on the court's inherent authority—the statute provided no authority at all to punish with a fixed jail term, and authorized a fine of no more than twenty dollars. Such a restriction would have emasculated the court's power to punish those who, through their obstinate refusal to answer questions, obstructed the effective administration of justice. The only other change of any significance in the statute since 1857[8] does not alter our

---

6. Under Maine law at the time of the 1847 act, justices of the peace and municipal and police courts had no general authority to punish contempt. *See* R.S. ch. 116 (1840) (power of justices of the peace in civil actions); *id.* ch. 170 (power of justices of the peace in criminal offenses); *id.* ch. 98 (power of municipal and police courts). These limited tribunals had only that authority specifically provided by statute. *Martin v. Fales,* 18 Me. 23, 28 (1840) (justice of peace has no inherent authority in civil action to continue a case but can respond only as prescribed by statute); 47 Am.Jur.2d *Justices of the Peace* § 30 (1969).

7. The 1857 revision read:
   Sec. 86. When a witness in court refuses to answer such questions as the court allows to be put, he may be fined not exceeding twenty dollars, and committed until the fine and costs of commitment are paid.
   R.S. ch. 82, § 86 (1857).

8. After 1857 the development of this provision can be traced through the revised statutes as follows: R.S. ch. 82, § 91 (1871); R.S. ch. 82, § 102 (1883); R.S. ch. 84, § 116 (1903); R.S. ch. 87, § 121 (1916); R.S. ch. 96, § 123 (1930); R.S. ch. 100, § 125 (1944); R.S. ch. 113, § 124

understanding. The 1907 amendment, P.L. 1907, ch. 145, adding a maximum three-month sentence of imprisonment and increasing the possible fine to $100 that could be imposed in the alternative, affects in no way the underlying character of the statute. Section 155 throughout its history has provided separate and independent statutory authority for punishing the refusal to answer questions in court.

When the Superior Court imposed nine-month jail terms on Robert and Rita Willoughby, it was not acting under section 155 but was instead exercising its inherent authority to punish contempt. Therefore, the punishment the sentencing court could give the recalcitrant witnesses was not limited by the maximum sentence permitted on a section 155 prosecution.

The entry is:

Judgments affirmed.

All concurring.

(1954). The provision was also amended by     P.L.1907, ch. 145.